United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 22, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 10, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 01-10646

TED CALVIN COLE,
now known as Jalil Abdul-Kabir,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

--------------------
Appeal from the United States District Court
for the Northern District of Texas

--------------------

**ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES**

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

This case returns to us on remand from the Supreme Court in light of its recent opinion in Tennard v. Dretke.[1] Petitioner-Appellant Ted Calvin Cole argues that a trio of recent cases —— Tennard, Smith v. Texas,[2] and Bigby v. Dretke[3] —— require reversal of the district court's denial of his 28 U.S.C. § 2254 habeas

---

[1] —— U.S. ——, 124 S. Ct. 2562 (2003).

[2] —— U.S. ——, 125 S. Ct. 400 (2003).

[3] 402 F.3d 551 (5th Cir. 2005).

corpus petition and petition for a certificate of appealability ("COA"). Cole asserts that the Texas capital sentencing scheme's special issues did not allow the jury to give "full consideration and full effect" to the mitigating evidence that he presented at the punishment phase of his trial. We reverse the district court's denial of a COA, grant Cole a COA on his <u>Penry</u> claim, but ultimately affirm the district court's denial of habeas relief.

## I. FACTS AND PROCEEDINGS

In December 1987, Cole was staying at an abandoned motel with his stepbrother, Michael Hickey ("Michael"), and Michael's wife, Kelly Hickey ("Kelly"). Cole mentioned to the Hickeys that he was willing to kill someone to obtain cash. Cole and Michael decided to rob Kelly's grandfather, Raymond Richardson, and then strangle him to death.

Two days after this conversation, Cole, Michael, and Kelly went to Richardson's home and visited with him in his living room for several hours. The group moved to the kitchen. As Richardson left the kitchen, Cole pushed him to the floor, where Richardson landed face down. Cole then sat on Richardson's back and strangled him with a dog leash that the men had brought to the house for this purpose. After Richardson died, the group put his body under his bed. They searched the house for cash, finding twenty dollars in Richardson's wallet. Michael took the cash from the wallet, and Cole took the money to the grocery store to buy beer and bacon.

2

Cole returned to Richardson's house and shared the groceries with Michael. The morning after the murder, Kelly and Michael surrendered themselves to the police and gave statements. Kelly eventually testified at Cole's trial.

The police arrested Cole at Richardson's home the morning after the murder. Cole gave the police two statements in which he confessed to having murdered Richardson. The statements were introduced against Cole at trial. In one of these statements, Cole admitted that the group decided to strangle Richardson because "it was quiter [sic] then [sic] shooting him and not as messy as cutting his throat and it just seemed the easiest way to do it." The jury found Cole guilty of the capital murder of Richardson while in the course of committing and attempting to commit robbery.

In response to special issues at the end of the penalty phase, the jury answered that (1) Cole had deliberately killed Richardson, and (2) there was a probability that Cole posed a threat of future dangerousness. The trial court accordingly sentenced Cole to death. The Texas Court of Criminal Appeals ("TCCA") affirmed Cole's conviction and sentence, and the United States Supreme Court denied his petition for a writ of certiorari.

Cole filed an application for post-conviction relief in state court, raising, inter alia, a Penry v. Lynaugh[4] claim. The trial court recommended denying Cole's application, and the TCCA did so.

---

[4] 492 U.S. 302 (1989) ("Penry I"), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304 (2002).

Cole then filed a 28 U.S.C. § 2254 habeas corpus petition in the district court, raising six claims, including the Penry claim and an ineffective assistance of counsel claim. As to his Penry claim, Cole argued in the district court that his mitigating evidence of a "destructive family background" and of "organic neurological defects" — specifically, a lack of impulse control — was "constitutionally relevant mitigating evidence" under our precedent. Cole also argued that Texas's two special issues were not an effective vehicle for the jury to give "full consideration and full effect" to his mitigating evidence.

The district court held that Cole's evidence fell short of our standard for "constitutionally relevant" mitigating evidence. The district court also concluded that, regardless of any possible constitutional relevancy, the mitigating evidence that Cole presented during the penalty phase was fully within the jury's reach given the broad scope of the special issues.[5] The district court ultimately denied all of Cole's claims on the merits. The district court further denied Cole's motion to alter or amend the

_____

[5] The district court stated:
Evidence of Cole's destructive family background evidence [sic] could be considered under the future dangerousness special issue.
Evidence of Cole's organic neurological deficiency could be considered under either the deliberateness or the future dangerousness special issues. Testimony regarding Cole's lack of impulse control was offered to explain the offense and demonstrate a capacity for change through his "outgrowing" the impulsivity over time. The relevance of this evidence to the future dangerousness inquiry of the second issue is readily apparent.

4

judgment under Federal Rule of Civil Procedure 59(e) and Cole's motion for a certificate of appealability ("COA").

Cole appealed the district court's denial of his Section 2254 habeas corpus petition, his motion to alter or amend the judgment, and his application for a COA. We denied Cole's motion for a COA as to his Penry claim. We held that reasonable jurists would not debate the district court's conclusion that Cole's evidence was not constitutionally relevant mitigating evidence. Cole asked us to reconsider our denial of a COA on this claim in light of the Supreme Court's grant of certiorari in Smith v. Dretke[6] and Tennard v. Dretke.[7] We rejected Cole's argument, denied his motion for reconsideration, and ultimately affirmed the district court's denial of Cole's Section 2254 habeas corpus petition.

Cole appealed to the Supreme Court. In light of its opinion in Tennard, in which the Supreme Court rejected our "constitutional relevancy" test for mitigating evidence, the Court vacated our panel opinion[8] and remanded for further proceedings consistent with Tennard.

## DISCUSSION

Section 2253 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") forecloses appeal from a state habeas proceeding

---

[6] 124 S. Ct. 46 (2003).

[7] 124 S. Ct. 383 (2003).

[8] Abdul-Kabir v. Dretke, 125 S. Ct. 496 (2004). Cole changed his name to Jalil Abdul-Kabir when he adopted the Muslim faith.

unless a circuit justice or judge issues a COA.[9]  We may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."[10]  To make this showing, Cole must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[11]

In determining whether to grant a COA, we are limited "to a threshold inquiry into the underlying merit[s] of [Cole's] claims."[12]  This threshold inquiry "does not require full consideration of the factual and legal bases adduced in support of the claims."[13]  Instead, we base our determination on "an overview of the claims in the habeas petition and a general assessment of their merits."[14]  When the district or state court has imposed the death penalty, "any doubts as to whether a COA should issue must be resolved in [petitioner's] favor."[15]

---

[9] 28 U.S.C. § 2253(c)(1)(A).

[10] Id. § 2253(c)(2).

[11] Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 483 (2000)).

[12] Miller-El, 537 U.S. at 327.

[13] Id. at 336.

[14] Id.

[15] Miller v. Dretke, 404 F.3d 908, 913 (5th Cir. 2005) (citing Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000)).

Cole argues that he is entitled to a COA on his claim that the Texas capital sentencing scheme's two special issues did not allow the jury to give "full consideration and full effect" to the mitigating evidence that he presented at the punishment phase of his trial. Specifically, Cole argues that <u>Tennard</u> and <u>Smith</u> — as well as our recent opinion in <u>Bigby</u> — require reversal of the district court's denial of his Section 2254 habeas corpus petition and request for a COA.

Texas's capital punishment scheme must meet two requirements to comply with the Eighth Amendment. First, it must "channel the discretion of judges and juries to ensure that death sentences are not meted out wantonly or freakishly."[16] Second, it must "confer sufficient discretion on the sentencing body to consider the character and record of the individual offender."[17] Accordingly, any relevant mitigating evidence "cannot be placed beyond the effective reach of the jury."[18] To prevail on a <u>Penry</u> claim, Cole must demonstrate that (1) the mitigating evidence adduced at the penalty phase of his trial meets the "low threshold for

---

[16] <u>Graham v. Collins</u>, 506 U.S. 461, 468 (1993).

[17] <u>Bigby</u>, 402 F.3d at 564 (citing <u>Graham</u>, 506 U.S. at 468).

[18] <u>Id.</u> (citing <u>Graham</u>, 506 U.S. at 475).

7

relevance;"[19] and, if so, (2) the evidence was beyond the effective reach of the jury.[20]

Before Tennard, to demonstrate that evidence was constitutionally relevant and mitigating, we required a petitioner to show that (1) he had a "uniquely severe permanent handicap" acquired through no fault of his own, and (2) there was a nexus between the offense and the petitioner's "severe permanent condition."[21] In our original panel opinion, we held that Cole had failed to demonstrate "that jurists of reason could debate the correctness of the district court's determination that the nexus requirement applie[d] to his Penry claim."

In Tennard, the Supreme Court explicitly rejected our "constitutional relevance" test.[22] The Tennard court stated:

> The Fifth Circuit's test has no foundation in the decisions of this Court. Neither Penry I nor its progeny screened mitigating evidence for "constitutional relevance" before considering whether the jury instructions comported with the Eighth Amendment. Indeed, the mitigating evidence presented in Penry I was concededly relevant so even if limiting principles regarding relevance were suggested in our opinion — and we do not think they were — they could not have been material to the holding.[23]

---

[19] Tennard, 124 S. Ct. at 2570.

[20] See Bigby, 402 F.3d at 564-65; Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994).

[21] Davis v. Scott, 51 F.3d 457, 460-61 (5th Cir. 1995), overruled in part by Tennard, 124 S. Ct. at 2569-70.

[22] 124 S. Ct. at 2570.

[23] Id. (emphasis in original) (citations omitted).

8

The <u>Tennard</u> Court also clarified the standard for relevant mitigating evidence:

> We established that the meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard — any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — applies.[24]

Because we relied on the "nexus" requirement to deny Cole a COA on his <u>Penry I</u> claim, and because the district court relied — at least in part — on our now-defunct test, we hold that jurists of reason could debate whether Cole's mitigating evidence is relevant. Accordingly, we grant Cole a COA on this claim.

### 1. Relevant Mitigating Evidence

We must first determine whether Cole's mitigating evidence meets the low threshold for relevance as articulated by the <u>Tennard</u> Court.[25] The district court correctly classified Cole's mother's testimony of a destructive family background as follows:

> A. Cole's mother was an alcoholic who was unable to care for her children.
> B. Cole's father was arrested for trying to rob a liquor store.
> C. Cole's father deserted the family when Cole was five years old.[26]

---

[24] <u>Id.</u> (citing <u>Mckoy v. North Carolina</u>, 494 U.S. 433, 440-41 (1990)) (quotations omitted).

[25] 124 S. Ct. at 2570.

[26] Cole's mother testified as to the last time Cole saw his father:
The last time he saw his father, his father brought him

D.   Cole's mother then moved with her children to her parents' home.
E.   Cole's grandparents were alcoholics who did not want the children to live with them.
F.   Cole was isolated from other children because his grandparents' home was eight miles out of town.
G.   School buses did not run to the grandparents' home, and the grandparents did not allow Cole's mother to use their car to take Cole to school.
H.   Cole was placed in a children's home at the age of five.
I.   During Cole's five years in the home, his mother visited him only twice.
J.   Cole's father never visited him at the home.
K.   Cole's uncle adopted Cole's brother, but not Cole.

Dr. Jarvis Wright, a psychologist who administered a battery of psychological and neuropsychological tests to Cole, testified at Cole's punishment phase that Cole had a "very rugged, rough childhood," that he experienced "a bad, very painful background, and that he "never felt loved and worthwhile in his life." Dr. Wright stated that Cole had repressed many of the memories of his turbulent childhood. Dr. Wright also testified that Cole's family background led him to experience "terrific needs for nurturance," a "fragmented personality," and "chronic depression." He stated that while awaiting trial, Cole was so "distressed" and "distraught" that he tried to commit suicide by cutting his own throat.

---

to San Angelo. He had took [sic] him off to Abilene and brought him in [sic] San Angelo and dropped him off a block from where he thought I lived and said, "Your mother lives down in that block. Go find her," and drove off. That's the last time he had seen [sic] his father.

The district court rejected Cole's "family background" evidence as relevant mitigating evidence because "[n]o testimony was presented that these events caused any type of psychological effect on Cole" and "Cole fail[ed] to show that his commission of capital murder was in any way attributable to his 'destructive family background.'"

Given the low threshold for relevant mitigating evidence articulated by the <u>Tennard</u> Court, we find that evidence of Cole's turbulent family background constitutes relevant mitigating evidence. Cole need not show that any psychological condition caused by his destructive family background is linked to his conduct; he need only show that it existed, and that a jury could find that a sentence other than death would be warranted.[27] The district court erred when it rejected Cole's evidence of a destructive family background under the "nexus" test expressly rejected by the Supreme Court in <u>Tennard</u>. The Supreme Court itself has sanctioned evidence of family history and emotional disturbance as relevant mitigating evidence.[28]

---

[27] <u>See Tennard</u>, 124 S. Ct. at 2570; <u>see also Skipper v. South Carolina</u>, 476 U.S. 1, 5 (1986) (holding that evidence of a defendant's good conduct in jail, while not related specifically to his culpability for the crime that he committed, must be allowed before the jury because "such evidence would be mitigating in the sense that it might serve as a basis for a sentence less than death").

[28] <u>See, e.g., Eddings v. Oklahoma</u>, 455 U.S. 104, 115 (1982) ("Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence. . . Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in

11

We also conclude that Cole's evidence of "organic neurological deficiency" — specifically, a lack of impulse control — is relevant mitigating evidence. Dr. Wright explicitly testified that Cole suffered from diminished impulse control. He stated:

> Ted[29] lacks a great deal of impulse control. And I think that's important in these tests I gave. . . . It indicates some central nervous damage or very likely central nervous damage. Combine that and all the other factors of Ted's background, all these other things, we're going to have an individual with some real problems with impulse control.[30]

Dr. Wright also stated that the combination of Cole's destructive childhood of neglect and abandonment had impaired his judgment and his ability to control his behavior. According to Dr. Wright, Cole learned to cope with reality by living in a "fantasy" world. Dr. Wright testified that although Cole started out in life with "fantastic raw material," the abandonment, neglect, and mistreatment that he suffered as a child left his personality "very damaged" and "horribly" distorted.

The district court rejected Cole's evidence of organic neurological deficiency because the "[t]estimony from Dr. Jarvis Wright fail[ed] to establish that Cole actually suffers from any organic brain damage, let alone that the disorder constitutes a

mitigation.").

[29] "Ted" refers to Cole in the direct citations from the record.

[30] Although Cole scored in the bottom five per cent of the population on some of the tests, he scored a 132 on an I.Q. test.

12

'uniquely severe handicap' to which Cole's criminal act was attributable."[31] Because it relied on a test that  the Supreme Court has "never countenanced" and has now "unequivocally rejected," the district court "'assessed [Cole's] claim under an improper legal standard.'"[32]  That Cole's evidence was relevant for purposes of mitigation is now clear under current Supreme Court precedent.[33]

2.   Jury Instructions

With that background to establish the framework of our analysis, we turn to the principal issue in dispute — whether, at the punishment phase of his trial, Texas's special issues allowed Cole's jury to give full consideration and effect to the evidence

---

[31] The district court also rejected Cole's evidence of organic neurological deficiency as relevant mitigating evidence because the "evidence [was] entirely insufficient to prove that Cole did, in fact, suffer from an organic neurological deficit."  As noted above, however, because the district court applied an improper test to screen the mitigating evidence, it erred.  Further, it is within the sentencer's province to accord the appropriate weight to any mitigating evidence. See, e.g., Shannon v. State, 942 S.W.2d 591, 597 (Tex. Ct. Crim. App. 1996) ("Instead, jurors must individually determine what evidence, if any, mitigates against the imposition of the death penalty, and what weight, if any, to give that evidence in its consideration.").  Because any possible organic deficiency could weigh against a death sentence, it is relevant mitigating evidence under Tennard.

[32] Smith, 125 S. Ct. at 405.

[33] See Lockett v. Ohio, 438 U.S. 586, 604 (1978) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (emphasis in original and added)); see also Tennard, 124 S. Ct. at 2573 ("Impaired intellectual functioning is inherently mitigating.") (citing Atkins v. Virginia, 536 U.S. 304, 316 (2002)).

13

of destructive family background and organic neurological deficiency. Cole argues that a COA should issue because reasonable jurists could disagree with the district court's conclusion that his relevant mitigating evidence was not beyond the effective reach of the jury. In light of the Supreme Court's opinion in Smith and our recent opinion in Bigby, we conclude that jurists of reason could debate the district court's conclusion that Cole's mitigating evidence was not beyond the effective reach of the jury. Accordingly, we reach the merits of Cole's claim.

At the end of the punishment phase of the trial, the state trial court instructed the jury to consider two special issues pursuant to Texas Code of Criminal Procedure article 37.071(b):

(1) Was the conduct of the defendant, TED CALVIN COLE, that caused the death of the deceased, RAYMOND C. RICHARDSON, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Is there a probability that the defendant, TED CALVIN COLE, would commit criminal acts of violence that would constitute a continuing threat to society?

The jury charge also contained the following supplemental instruction:

You are further instructed that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of this case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to the Special Issues hereby submitted to you.

14

Cole contends that, in violation of Penry I, the two special issues "shackled and confined" the jury's consideration of his mitigating evidence and provided no vehicle for the jury to give it full mitigating effect.

At the punishment phase of the trial in Penry I, the defense presented mitigating evidence of Penry's mental retardation and severe physical abuse. At the conclusion of the penalty phase, the trial court instructed the jury to consider the two special issues that we address here.[34] The jury answered "yes" to the special issues, and the trial court sentenced Penry to death.

In the Supreme Court, Penry argued that Texas's special issues did not allow the jury to give consideration and effect to his mitigating evidence. The Court agreed, holding that "in certain cases Texas'[s] statutory special issues, as applied, d[o] not give the jury sufficient opportunity to consider and give effect to the mitigation evidence without appropriate additional instructions."[35] Thus, when the mitigating evidence offered by the defendant (1) is not relevant to the special issues, or (2) is beyond the scope of the special issues, and "the jury [is] otherwise unable to express its reasoned moral response to that evidence in rendering its sentencing decision," the sentencing court must provide the jury

---

[34] The Penry I trial court also instructed the jury to consider a third special issue — whether the defendant's conduct was an unreasonable response to any provocation by the victim — which is not at issue here.

[35] Bigby, 402 F.3d at 568 (citing Penry I, 492 U.S. at 318).

15

with additional instructions to inform it that it may consider and give effect to a defendant's mitigating evidence.[36]

At Penry's retrial, on remand from the Supreme Court, the state court instructed the jury to answer the special issues but included a supplemental instruction that the jury was to consider any mitigating evidence offered by Penry during the punishment phase:

> If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability <u>at the time you answer the special issues</u>. If you determine, when giving effect to the mitigation evidence, if any, that a life sentence, <u>as reflected by a negative finding to the issue under consideration</u>, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, <u>a negative finding should be given to one of the special issues</u>.[37]

The jury again found Penry guilty, he was again sentenced to death, and he again appealed.

The Supreme Court held that the trial court's supplemental instruction was "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence."[38] The Court first clarified that

> <u>Penry I</u> did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the

---

[36] <u>Id.</u>

[37] <u>Penry v. Johnson</u> ("<u>Penry II</u>"), 532 U.S. 782, 797-98 (2001) (emphasis in original) (quoting trial court).

[38] <u>Id.</u> at 790.

16

Eighth Amendment.  Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence.  Rather, the key to Penry I is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence."[39]

Concentrating on the italicized language in the state court's supplemental instruction, the Court found the instruction constitutionally inadequate because "the jury's ability to consider and give effect to Penry's mitigating evidence was still 'shackled and confined within the scope of the three special issues,'"[40] which were not broad enough to encompass Penry's evidence of mental retardation and childhood abuse.

The Court also explained that even if the supplemental instruction and verdict form had allowed the jury to respond in the negative to one of the special issues and thereby avoid sentencing Penry to death, it "would have been both logically and ethically impossible for a juror to follow both sets of instructions," i.e., the special issues instructions and the supplemental instruction.[41] The Court reasoned:

Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental

---

[39] Id. at 797 (citations omitted) (alteration and emphasis in original).

[40] Id. at 798 (quoting Penry v. Johnson, 215 F.3d 504, 514 (5th Cir. 2000) (Dennis, J., dissenting)).

[41] Id. at 799.

17

instruction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a "'true verdict.'"[42]

The supplemental instruction thus inserted "an element of capriciousness" into the jury's sentencing decision, because a juror would have had to be willing to elevate the supplemental instruction over the verdict form instruction.[43] The Court also concluded that "a clearly drafted catchall instruction on mitigating evidence . . . might have complied with Penry I," specifically noting that Texas's current capital sentencing scheme now includes such a catchall provision.[44]

In Smith v. Texas, the Supreme Court confronted jury instructions similar to those in Penry II and again held the

---

[42] Id. at 799-800.

[43] Id. at 800.

[44] Id. The current Texas statutory scheme provides:
The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article [the special issues subsection], it shall answer the following issue:
Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
TEX. CODE CRIM P. art. 37.071(2)(e)(1).

18

instructions unconstitutional.[45]  The Court first held that the special issues were not broad enough to encompass Smith's evidence of organic learning disabilities and speech handicaps, a low IQ, and a drug-addicted criminal father.[46]  Although the Smith instructions were not identical to those in Penry II, the Court found any difference constitutionally insignificant because, as we noted in Bigby, the Smith jury still "faced . . . the ethical dilemma of either answering the special issue questions in a manner prescribed on the verdict form and ignoring the supplemental

---

[45] — U.S. —, 125 S. Ct. 400 (2004).  The supplemental instruction in Smith read as follows:

> You are instructed that you shall consider any evidence which, in your opinion, is mitigating . . . . You may hear evidence which, in your judgment, has no relationship to any of the Special Issues, but if you find such evidence is mitigating under these instructions, you shall consider it in the following instructions of the Court.  You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the Special Issues, deserves.  In answering the Special Issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the Special Issues are "Yes," and you also believe from the mitigating evidence, if any, that the Defendants should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you.  In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you.

Id. at 402-03.

[46] Id. at 407.

19

instruction, or answering the questions as prescribed by the supplemental instruction which necessarily meant ignoring the verdict form."[47]   The Court concluded that the supplemental instruction unconstitutionally shackled the jury's consideration of Smith's mitigating evidence to the special issues.[48]

With this in mind, we address Cole's claim that Penry I, Penry II, Tennard, and Smith require reversal of the district court's denial of his habeas application.  Cole contends that the special issues are not broad enough to encompass his mitigating evidence of a destructive family background and an organic neurological deficiency, including diminished impulse control.  Specifically, Cole argues that the two special issues do not provide an adequate vehicle for the jury to consider his mitigating evidence.  As the Supreme Court has expressly limited Penry I's application to cases in which "the constitutional defect lay in the fact that relevant mitigating evidence [is] placed beyond the effective reach of the sentencer,"[49] we must first determine whether the special issues are broad enough to encompass Cole's mitigating evidence.  We conclude that they are.

Cole's reliance on Penry I, Penry II, Tennard, and Smith is misplaced.  Penry I and II are readily distinguishable from this

---

[47] Bigby, 402 F.3d at 570.

[48] See id. at 572.

[49] Graham, 506 U.S. at 475; see Bigby, 402 F.3d at 570.

20

case. In Johnson v. Texas,[50] the Supreme Court confirmed the limited scope of Penry I and II. Although the defendant in Johnson insisted that the Texas special issues prevented the jury from considering the mitigating effect of his youth,[51] the Court rejected that argument and, in doing so, clarified Penry's scope.

In Johnson, the Court explained that in Penry, "there was expert medical testimony that the defendant was mentally retarded and that his condition prevented him from learning from his mistakes."[52] As the expert testimony intimated that Penry was unable to learn from his mistakes, the Johnson Court concluded that the only logical manner in which Penry's jury could have considered the evidence of his mental retardation under the future dangerousness special issue was as an aggravating factor: Penry would remain a danger in the future because there was no chance that he would ever understand that rape and murder were wrong.[53] Thus, Penry's jury was unable to give any mitigating effect to the mental retardation evidence that he proffered.

Here, however, the mitigating evidence of Cole's destructive family background and organic neurological deficiency falls outside of Penry's holding. With regard to Cole's mitigating evidence of

---

[50] 509 U.S. 350 (1993).

[51] See id. at 368.

[52] Id. at 369 (citing Penry I, 492 U.S. at 308-09).

[53] See id. (citing Penry I, 492 U.S. at 323).

"organic deficiency," the testimony proffered by two of Cole's own expert witnesses is directly contrary to the testimony at Penry's penalty phase that the Penry Court found aggravating. In response to direct questions on Cole's future dangerousness, Dr. Wright provided the following testimony:

> I think the research certainly indicates that individuals like Ted, individuals who have had this kind of background, tend to begin making changes at about forty, forty-five, fifty, somewhere in there. They tend to mellow a bit and change a good bit. You can infer that from some of the FBI statistics on age and changes in persons.
>
> But I think as we see him age, get older, hormones change, the process of aging takes over, as it does in all of us — and we all change. I think the evidence is overwhelming there that individuals who have behaved as he has change. They burn out. And I think there's a good chance of later in life — not now, but later in life — some changes.
>
> I'm suggesting that, as we grow older, we change; the compass points a different direction. We're tired. We're — we're — our goals, our orientation is different. The research indicates that — that this is the case with individuals who commit violent or antisocial acts.
>
> We also know from probabilities that, as people grow older, the probability of them becoming involved in violent acts decreases to the point of fifty, where the FBI statistics would indicate that they're almost — it almost doesn't happen. These behaviors have almost burned out of individuals. While they may be flaming while they're younger, they burn out later. So I don't have any specific statements for Ted as an individual. That would take a crystal ball. But for Ted as a — as a human being, we know this happens to human beings who are like Ted, who have histories like Ted. We know from statistics that they change, as we do all change.

Dr. Wright also testified that even though Cole's diary demonstrated a "fantasy" to behave like a "modern-day Viking" or a

"pirate," Cole was unlikely to act on such fantasies because he did not have the "wherewithal" to do so.

The former chief mental health officer for the Texas Department of Corrections, Wendel L. Dickerson, Ph.D., also testified on Cole's behalf. Dr. Dickerson first explained the process behind "predicting future behavior and future violent conduct in particular." He then testified:

> . . . on the basis of the statistical data available to use, that diagnosis would necessarily apply five, ten, fifteen years from now. I mean, whatever condition he is suffering from is not necessarily immutable and unchangeable. I mean it can be changed —— I mean, time changes —— I mean —— and experience changes people. Changes in body changes people.
>
> Old person gets older. Their hormones change. The brain changes. So it's —— I mean, just because he's dangerous —— if he's considered dangerous today, does not necessarily mean he's going to be dangerous at some future point in time.

In addition, although the State's expert witness testified that Cole would remain a danger as long as he lived, Dr. Dickerson attempted to rebut this testimony:

> Whenever we assert that someone is dangerous, we're saying that he's more likely to actually act out. However, when we reach that diagnosis —— it's been demonstrated in study after study that that diagnosis actually leads to —— is followed by violent conduct only about one in three times. So you're wrong —— whenever you say somebody is dangerous, say he's going to do something violent or aggressive, you're going to be wrong about twice as often as you're —— as you're right.

Unlike the evidence in <u>Penry</u>, Cole's mitigating evidence did not suggest that he was unable to learn from his mistakes. The record does not suggest that the jury viewed Cole's mitigating

23

evidence as an aggravating factor only, i.e., because he cannot learn from his mistakes, he will remain a danger in the future. Rather, the evidence proffered by Cole's expert witnesses suggested to the jury that Cole could change in the future.[54]  The evidence intimated that someone from Cole's abusive background begins to change later in life.  This evidence also suggests that even someone with a lower than normal IQ or an organic neurological deficiency changes later in life.  That this evidence fits well within the broad scope of the future dangerousness special issue is clearly evident from the testimony of Cole's own expert witnesses.

Further, the Supreme Court itself has indicated that "family background" evidence falls within the broad scope of Texas's special issues.  In Graham, the Court stated:

---

[54] This testimony also distinguishes Cole's case from Bigby's. In Bigby, the panel relied heavily on testimony that Bigby's schizophrenia "cannot be adequately controlled or treated."  402 F.3d at 571.  As with Penry's evidence that he was unable to learn from his mistakes, Bigby's mitigation evidence contained the same "double-edged sword" as Penry's.  See id.  Because Bigby's schizophrenia could not be controlled or treated, the jury could have considered it an aggravating factor under the future dangerousness issue.  See id.

At oral argument, counsel for the state conceded that the mitigating evidence that Cole presented at trial could perhaps be a double-edged sword.  We do not, however, read Penry I and Bigby to stand for the broad proposition that any evidence that the jury may deem either mitigating or aggravating can not be given effect under Penry I.  As we noted above, a jury can not give mitigating effect to evidence that can be seen as aggravating only.  See Penry I, 492 U.S. at 323 ("Although this [mental retardation] evidence is relevant to the second issue, it is relevant only as an aggravating factor because it suggests a 'yes' answer to the question of future dangerousness." (emphasis in original and added)).  Here, on the contrary, Cole's mitigating evidence does not suggest only a "yes" answer to the future dangerousness issue.

> Moreover, we are not convinced that <u>Penry</u> could be extended to cover the sorts of mitigating evidence Graham suggests without a wholesale abandonment of <u>Jurek</u> and perhaps also of <u>Franklin v. Lynaugh</u>. As we have noted, <u>Jurek</u> is reasonably read as holding that the circumstance of youth is given constitutionally adequate consideration in deciding the special issues. <u>We see no reason to regard the circumstances of Graham's family background and positive character traits in a different light</u>. Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse.[55]

The Supreme Court has drawn a significant distinction between the type of evidence that Penry presented at his trial and the evidence that Cole presented at his, which falls within the scope of Texas's special issues.

As the district court correctly concluded in its alternative analysis, Cole's mitigating evidence falls within the scope of the special issues. Specifically, the jury could have considered Cole's family background and organic deficiency evidence under —— at the least —— the future dangerousness special issue. Given the experts' testimony during the punishment phase, the jury could have believed them and found that, although Cole suffered a turbulent childhood and may suffer from diminished impulse control, he is capable of change and thus would not necessarily remain a danger in the future.

Neither <u>Tennard</u> nor <u>Smith</u> changes <u>Johnson</u>'s analysis of <u>Penry</u>, or the result that we reach today. As we have explained, the

---

[55] <u>Graham</u>, 506 U.S. at 476 (emphasis added).

25

principal concern of the Court in Tennard was our constitutional relevancy test, on which we relied to affirm the denial of Cole's habeas corpus petition. Whether the mitigating evidence that Tennard presented at the punishment phase of his trial fit within the scope of the special issues was of only secondary concern to the Court.[56] What mattered in Tennard was that under our constitutional relevancy test, most mitigating evidence would have been "screened out" before a court would ever have considered whether the evidence fell within the scope of the special issues.[57]

Further, explained the Tennard Court, our court should have answered the following question: "Has Tennard 'demonstrated that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong?'"[58] In conducting this analysis, the Court held that "[i]mpaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately."[59] It also stated that "[a] reasonable jurist could conclude that the jury might well have given Tennard's low IQ evidence aggravating effect in considering his future dangerousness, not only as a matter of

---

[56] Indeed, the Court devoted only the last paragraph of the opinion to the dispute present here. See Tennard, 124 S. Ct. at 2572-73.

[57] See id. at 2571.

[58] Id. at 2572 (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

[59] Id. at 2572 (citing Penry I, 492 U.S. at 322).

26

probable inference from the evidence but also because the prosecutor told them to do so . . . ."[60]

The situation here is distinguishable from that in Tennard. We recognize that the trial court failed to define "deliberately" with respect to the first special issue,[61] but we cannot conclude that the jury could have given Cole's mitigating evidence an aggravating effect. The state prosecutor did not ask the jury to consider Cole's mitigating evidence as aggravating. Neither did he "press[] exactly the most problematic interpretation of the special issues, suggesting that [Cole]'s low IQ was irrelevant in mitigation, but relevant to the question whether he posed a future danger."[62] Accordingly, Cole's prosecutor here did not place the jurors in the ethical dilemma of responding falsely to a special issue. And, as we explained above, under the instructions it was given, the jury could have considered and given effect to Cole's mitigating evidence under the future dangerousness special issue.

Neither does Smith require a different result. In Smith, the Court held that the state trial court's "nullification instruction" was constitutionally inadequate to provide the jury with an

---

[60] Id. The prosecutor stated, "[W]hether he has a low IQ or not is not really the issue. Because the legislature, in asking you to address that question, the reasons why he became a danger are not really relevant. The fact that he is a danger, that the evidence shows he's a danger is the criteria to use in answering that question." Id. (alteration in original).

[61] See Penry II, 532 U.S. at 803.

[62] Tennard, 124 S. Ct. at 2572.

27

effective vehicle to consider Smith's mitigating evidence of low IQ, youth, and family background.[63]  The Court concluded that the mandatory language in the charge "could possibly have intensified the dilemma faced by ethical jurors."[64]  The Court noted that, just as in Penry II, the Smith jurors were faced with having to voice a false answer to a special issue —— a special issue that they had sworn to uphold if the prosecution proved it beyond a reasonable doubt —— to avoid the death penalty.[65]

Here, however, the supplemental instruction[66] is distinguishable from the one given at either Smith's or Penry's trial.[67]  In Boyde v. California,[68] the Supreme Court delineated the

---

[63] 125 S. Ct. at 406-07.

[64] Id. at 407.  In Smith, the Court noted that the trial court instructed the jury that if "you also believe from the mitigating evidence, if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" . . . ."  Id. at 403 (emphasis added) (quoting trial court). For the full instruction, see supra note 45.

[65] See id.

[66] Cole contends that the supplemental instruction is a "nullification instruction," similar to those struck down as unconstitutional in both Smith and Penry.  We do not find that this is so.  The trial court's supplemental instruction did not "direct[] the jury to give effect to mitigation evidence, but allow[] the jury to do so only by negating what would be affirmative responses to two special issues relating to deliberateness and future dangerousness."  Id. at 401.  The supplemental instruction here merely instructed the jury to consider the mitigating evidence when deciding the special issues.

[67] For a full quotation of the instruction, see supra page 15.

[68] 494 U.S. 370 (1990).

28

standard under which we assess whether the jury instructions allowed the jury to consider and give effect to a defendant's mitigating evidence. There, the Court held that a reviewing court must determine "whether there is a <u>reasonable likelihood</u> that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[69] "Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than the mere possibility of such a bar."[70] To evaluate the instructions, we do not "engage in a technical parsing" of the language in the instructions, but instead "approach the instructions in that same way that the jury would —— with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'"[71]

The Supreme Court has upheld the use of this instruction —— almost word for word —— in <u>Johnson v. Texas</u>, in which it held that Texas's special issues were broad enough to encompass mitigating evidence of youth.[72] The difference in the language of the instruction upheld in <u>Johnson</u> and that struck down in <u>Penry II</u> and

---

[69] <u>Id.</u> at 380 (emphasis added).

[70] <u>Id.</u>

[71] <u>Johnson v. Texas</u>, 509 U.S. 350, 368 (1993) (quoting <u>Boyde</u>, 494 U.S. at 381).

[72] 509 U.S. at 355.

<u>Smith</u> is instructive. Whereas the instructions in <u>Smith</u> and <u>Penry</u> <u>II</u> specifically tied an answer to the special issues to the mitigating evidence, the instruction in <u>Johnson</u> merely instructed the jury to consider all of the evidence when answering the special issues. The import of the Supreme Court's focus on state trial court nullification instructions (which, as we note above, we do not have here) is to determine whether the jury was given conflicting duties, viz., to answer the special issues "yes" if the prosecution proves them beyond a reasonable doubt but to respond negatively to one of them (even if proven beyond a reasonable doubt) if the mitigating evidence demonstrates that the defendant does not merit a sentence of death, thereby violating their oath to respond truthfully to the special issues. The ethical dilemma in which the conflicting instructions place the jury constitute the constitutional violation.

We are not presented with that situation here. As in <u>Johnson</u>, Cole's state trial court instructed the jury to consider <u>all</u> of the evidence ⎯ from the guilt and punishment phases ⎯ when it responded to the special issues. The trial court used no mandatory language, instead instructing the jury that it "may" consider all of the evidence. Further, the instruction here did not specifically tie an answer to a special issue to the mitigating evidence.[73] Accordingly, the state trial court did not deliver

---

[73] This further distinguishes Cole's case from Bigby's. <u>See</u> <u>Bigby</u>, 402 F.3d at 572 ("Like the supplemental instructions in both

30

conflicting instructions that would place the jurors in an ethical dilemma. The trial court did not instruct the jury to answer "yes" to the special issues if the prosecution proved them beyond a reasonable doubt and then instruct them to respond "no" (falsely) to one of the special issues if the mitigating evidence demonstrated that Cole did not deserve death.

Cole advances that the special issues must allow the jury to be able to respond favorably to the specific facts of each defendant's case. Stated differently, Cole contends that "generic" mitigating evidence is not sufficiently particularized to allow the jury to give it mitigating effect. Specifically, Cole maintains that the evidence that he presented at the punishment phase of his trial supported only the proposition that "everyone" mellows as they tend to get older. Thus, he urges, such evidence is insufficient to allow the jury to consider the mitigating evidence with respect to Cole as an individual. Cole maintains that Smith supports this proposition.

We do not read Smith so broadly. Although we recognize that we must consider the particularized facts of each defendant's case, nothing in Smith supports Cole's argument that trial counsel must

---

Penry II and Smith, this instruction ties the jury's consideration of Bigby's mitigating evidence to the special issues. Specifically, it instructs the jury that if they find the mitigating evidence sufficient to warrant a life sentence rather than the death penalty, they must answer any special issues 'to which such mitigating circumstances apply' in the negative. Thus, the instruction effectively shackled and confined the jury within the scope of the special issues.").

31

submit "specific" —— as opposed to "generic" —— mitigating evidence at the punishment phase of trial. We do not have an ineffective assistance of counsel claim before us. Whether Cole's counsel should have presented more specific mitigating evidence is not a claim that we must reach today.

Further, we note that the mitigating evidence here is not as generic as counsel maintains. Both Dr. Wright and Dr. Dickerson explicitly referenced Cole when they testified at the punishment phase of the trial. Despite counsel's argument that the evidence supported only the proposition that all of us tend to "mellow" as we get older, Dr. Wright and Dr. Dickerson compared Cole to the "generic" and broad mitigating evidence that they presented. Indeed, as Dr. Wright noted, to be any more specific with regard to Cole's particular future behavior would require a "crystal ball." The specific references to Cole in Dr. Wright's and Dr. Dickerson's testimony lead us to conclude that the jury could easily have understood that they included Cole individually within the mitigating evidence that they presented.

## CONCLUSION

Because we conclude that jurists of reason could disagree with the district court's resolution of Cole's claims that the Texas special issues were not broad enough to allow the jury to give "full consideration and full effect" to his mitigating evidence, we reverse the district court's denial of a COA on Cole's Penry claim

32

and grant him a COA.  For the foregoing reasons, however, we ultimately conclude that the Texas special issues allowed the jury to give "full consideration and full effect" to the mitigating evidence that Cole presented at the punishment phase of his trial. We therefore affirm the district court's judgment denying habeas relief.

REVERSED; COA GRANTED; JUDGMENT DENYING HABEAS RELIEF AFFIRMED.